624 S.E.2d 572

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Larry G. DINGER, Defendant Below, Appellant.**

No. 32694.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 1, 2005.

Decided Dec. 1, 2005.

R. Thomas Czarnik, Esq., Princeton, for Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Robert D. Goldberg, Esq., Deputy Attorney General, Charleston, for Appellee.

PER CURIAM:

This case is before the Court on appeal from the July 2, 2003, sentencing Order of the Circuit Court of Monroe County and the September 17, 2004, Order of the Circuit Court of Monroe County denying Appellant's motion for a new trial. This Court has before it the petition for appeal, the response, the briefs of the parties, and all matters of record. Following the arguments of the parties and a review of the record herein, this Court finds that the circuit court erred in denying Appellant's motion for a new trial. Accordingly, this Court reverses the September 17, 2004, Order of the circuit court and remands the matter for retrial.

I.

FACTS

In the early morning hours of April 20, 2002, Mark McBride (hereinafter, "McBride") and Mac Lilly (hereinafter, "Lilly"), the victim in this case, went to the home of McBride's ex-wife, Tasha Pack (hereinafter, "Pack"). Pack shared her home with Larry Dinger (hereinafter, "Dinger"), whose two sons, aged twenty and twelve, were visit-

ing[1]. Shortly after arriving, Lilly, who had been drinking, passed out on the sofa. McBride, who had also been drinking, began making threats and engaged in an argument with Dinger's older son, Matthew. Dinger punched McBride, who was seated, in the face at least once, bloodying his nose. McBride did not retaliate, but, instead, collected himself for a few seconds and then left the house. He returned the next morning around eight, woke Lilly and told him what had happened. The pair left, but as they were leaving, McBride shouted, "We'll be back," which instigated another altercation between McBride and Matthew Dinger.

About an hour later, McBride's brother, Jason, and his cousin, Kenny Ray Steele, arrived at Pack's house and demanded to know what had happened to McBride. Pack diffused the situation, and Jason McBride and Steele left. An hour or two later, McBride, Lilly, and several other people went back to the Pack house. McBride, Lilly and two others approached the front porch while Pack went out into the yard to persuade the remaining members of the group to leave. Upon hearing the ruckus outside the house, Dinger grabbed a double action revolver and stuck it in the back waistband of his pants. He went out onto the porch to confront McBride, Lilly, and the others, all of whom seemed eager to fight. Pack ran to her father's home 100 yards away to call 911.[2] Dinger asked the group to leave, but they would not. When Dinger opened up the screen door to shoo his sons inside, one of the men, Alex Cline, slammed the door shut and blocked it with a chair stating, "You are not getting a f—ing gun." Dinger pulled the gun from his waistband, leveled it at the group, and said, "I don't have to, I have one."

It is at this point that the witnesses' statements begin to diverge. According to Dinger, Lilly grabbed the gun and said, "If you pull a gun, you'd better use it." Dinger asserts that when Lilly grabbed the gun, it went off. The gist of the testimony of those who had come to the Pack house with Lilly is that Lilly grabbed the gun, but that Dinger snatched it back out of Lilly's hands, at which point Lilly took a few steps backward. Those same witnesses assert that Dinger then leveled the gun at Lilly and shot him in the head. Lilly died of a single gunshot wound.

Dinger was indicted on November 19, 2002, on one count of murder.[3] On May 16, 2003, a jury returned a verdict finding Dinger guilty of voluntary manslaughter. Defense counsel filed a motion for a new trial or to set aside the verdict based on the court's failure to give requested "accident" and "inability to retreat" instructions, the court's error in allowing gruesome photographs into evidence, the State's failure to produce the gunshot residue test, and the court's error in not dismissing first and second degree murder charges prior to the jury's deliberation. The court denied the motion, but directed the State to preserve the gunshot residue test kit in order that the defense be allowed to conduct its own test. The court subsequently sentenced Dinger to twelve years in the penitentiary. Dinger appealed his conviction to this Court on January 26, 2004.

On March 16, 2004, defense counsel again moved for a new trial based upon the results of the gunshot residue test as performed by the defense's expert, Robert S. White (hereinafter, "White"). White's findings seemed to contradict those of State Police Analyst

---

1. There had been some interaction between McBride, Dinger, Dinger's older son, and Pack earlier in the evening at a local dining establishment, but it does not appear that the interplay was acrimonious. Likewise, Lilly had also met up with Dinger, Dinger's son, and Pack earlier at the same establishment, but again, there was no indication of hostility or ill feelings between the parties. In fact, Dinger gave a drunk Lilly a ride home.

2. There was no phone in the Pack house.

3. The indictment, in pertinent part, read:

The grand jurors of the State of West Virginia, in and for the body of the County of Summers, upon their oaths, present that Larry Dinger, on or about the 19th day of April, 2002, in said County of Summers, West Virginia, did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder Mac Burton Lilly, in violation of West Virginia Code Section 61–2–1, and against the peace and dignity of the State.

The case was later moved to Monroe County based upon a change of venue motion.

Koren Powers (hereinafter, "Powers"). While Powers found no particles of gunshot residue on Lilly's hands, White found particles of gunshot residue on Lilly's hands. Dinger forwarded a copy of his motion on to this Court; and on April 1, 2004, this Court remanded the case to the circuit court for a hearing on the motion for a new trial on the ground of newly discovered evidence.

Following an evidentiary hearing, the circuit court denied the motion on September 17, 2004. The present appeal followed, raising issues from both the trial and denial of the motion for new trial.

## II.

## STANDARD OF REVIEW

■ There are six issues before this Court, but we find one to be dispositive, and that is the issue of whether the court erred in failing to give a requested defense instruction. We have held that "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. Pt. 1, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996). Syl. Pt. 1, *State v. Brooks*, 214 W.Va. 562, 591 S.E.2d 120 (2003). In regard to the issue of the circuit court's failure to grant a new trial, we have held that " '[a] trial judge's decision to award a new trial is not subject to appellate review unless the trial judge abuses his or her discretion.' Syl. Pt. 3, in part, *In re State of West Virginia Public Bldg. Asbestos Litigation*, 193 W.Va. 119, 454 S.E.2d 413 (1994), cert. denied sub nom. *W.R. Grace & Co. v. West Virginia*, 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995)." Syl. Pt. 2, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

4. The court instructed the jury as follows:
One of the questions to be determined by you in this case is whether or not the Defendant acted in defense of himself or others so as to justify his acts. Under the laws of this state, if the Defendant was not the aggressor, and had reasonable grounds to believe and actually did believe that he or others were in imminent danger of death or serious bodily harm from which

## III.

## DISCUSSION

On appeal, Dinger raises six issues. They are (1) whether the circuit court erred in failing to grant a new trial on the basis of newly discovered evidence (i.e. the results of the gunshot residue test), (2) whether the circuit court erred in allowing gruesome pictures into evidence, (3) whether the circuit court erred in failing to give the defense's "accident" and "inability to retreat" instructions, (4) whether the circuit court erred in not dismissing the case upon the defense's motions at the close of the State's case in chief, (5) whether the circuit court erred in not dismissing the indictment, and (6) whether the circuit court erred in not dismissing first and second degree murder charges prior to the jury's deliberation. We find the issue of the defense's proposed "inability to retreat" instruction to be dispositive, so we turn first to it.

### A. Failure to Give the Defense's "Inability to Retreat" Instruction

■ At trial, the defense proposed certain instructions for inclusion in the jury charge, four of which were later withdrawn. The remaining two instructions were refused, and it is those instructions which are at the heart of Dinger's argument. The first instruction was this:

A person who is without fault in an altercation has no duty to retreat while acting in self defense. If the person is in a substantial degree at fault, he must retreat if able to do so, [sic] however, if from the fierceness of the attack or if they [sic] are prevented from retreating, or for other reasons they [sic] are unable to retreat, they will be excused by the law from not doing so.

The circuit court gave a general instruction on self defense and the defense of others; [4]

he could save himself or others only by using deadly force against his assailant or assailants, then he had the right to employ deadly force in order to defend himself or others. By deadly force is meant force which is likely to cause death or serious bodily harm.
In order for the Defendant to have been justified in the use of deadly force in self-defense or in defense of others, he must not have provoked

however, it gave no instruction as to the duty to retreat. Dinger argues that the court's general instruction was insufficient in light of the facts of this case. The State argues that the defense's proposed instruction on the duty to retreat is incorrect as a matter of law and duplicative or irrelevant.

■ To be sure, " '[i]nstructions must be based upon the evidence and an instruction which is not supported by evidence should not be given.' Syl. pt. 4, *State v. Collins*, 154 W.Va. 771, 180 S.E.2d 54 (1971)." Syl. Pt. 3, *State v. Leonard*, 217 W.Va. 603, 619 S.E.2d 116 (2005). We went on in *Leonard* to say:

> With regard to instructing the jury, the general standard of review, as set forth in Vol. 2, F.D. Cleckley, Handbook on West Virginia Criminal Procedure 2d, p. 216 (Michie—1993), is that jury instructions are reviewed to determine if they are supported by the evidence and are a correct statement of the law. Accordingly, this Court has indicated that, while the giving or refusing of a particular instruction is subject to an abuse of discretion standard, the question of whether the jury was thus properly instructed "is a question of law, and the review is *de novo*." Syl. Pt. 1, *State v. Brooks*, 214 W.Va. 562, 591 S.E.2d 120 (2003); Syl. Pt. 2, *State v. Blankenship*, 208 W.Va. 612, 542 S.E.2d 433 (2000).

*Id.* at 607, 619 S.E.2d at 120. We believe that the "duty to retreat" instruction offered by Dinger is supported by the evidence in this case. Dinger found himself roused from his residence by a small mob who had gathered on his lawn and at the edge of his porch looking for a fight.[5] Certain of those men and women standing outside the house had come by earlier in the day and had promised to come back. As mentioned previously, one of those men, Alex Cline, had stepped up onto the porch and had purposefully blocked the door to the house, depriving Dinger of the only retreat he did have. The victim in this case, Lilly, had stepped on and off of the porch as well, slapping his chest and inviting a confrontation.

■ This Court long ago recognized that "[i]t is only the faultless, who are exempt from the necessity of retreating while acting in self-defense. Those in fault must retreat, if able to do so; if from the fierceness of the attack or for other reasons they are unable to retreat, they will be excused by the law for not doing so." *State of W. Va. v. Greer*, 22 W.Va. 800, 819 (1883). *See also, State v. Saunders*, 175 W.Va. 16,17–18, 330 S.E.2d 674, 675–676 (1985). We have also held that:

> " '[w]hen one without fault himself is attacked by another in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life, or to do him some great bodily harm, and there is reasonable grounds for believing the danger imminent, that such design will be accomplished, and the person assaulted has reasonable ground to believe, and does believe, such danger is imminent, he may act upon such appearances *and without retreating*, kill his assailant, if he has reasonable grounds to believe, and does believe, that such killing is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out, that the appearances were false, and that there

---

the assault on him or have been the aggressor. Mere words, without more, do not constitute provocation or aggression.

The circumstances under which he acted must have been such as to produce in the mind of a reasonable prudent person, similarly situated, the reasonable belief that the other person or persons were about to kill him or them or to do him or them serious bodily harm. In addition, the Defendant must have actually believed that he or they were in imminent danger of death or serious bodily harm and that deadly force must be used to repel it. The mere fact the victim may have not used a deadly weapon during the altercation does not deprive the Defendant Larry Dinger of the right of self-defense or defense of others.

If evidence of self-defense or defense of others is present, the State must prove beyond a reasonable doubt that the Defendant did not act in self-defense. If you find that the State has failed to prove beyond a reasonable doubt that the Defendant did not act in self-defense or defense of others, you must find the Defendant not guilty. In other words, if you have a reasonable doubt as to whether or not the Defendant acted in self-defense or defense of others, your verdict must be not guilty.

5. While the house actually belonged to his girlfriend, Dinger had made it his residence.

was in fact neither design to do him some serious injury nor danger, that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case.' Syl. Pt. 7, *State v. Cain*, 20 W.Va. 679 (1882)." Syl. Pt. 6, *Feliciano v. 7–Eleven, Inc.*, 210 W.Va. 740, 559 S.E.2d 713 (2001) (emphasis added).

Clearly, a retreat instruction was appropriate for the jury in view of the facts brought out at trial.

■ Because Dinger's proposed instruction in these circumstances is in line with the Court's sentiments in both *Greer* and *Feliciano*, it cannot be said to be in inaccurate. It is also neither duplicative nor irrelevant as the duty to retreat was not discussed in the circuit court's self-defense instruction but was certainly relevant given the evidence presented to the jury. Therefore, we believe that the circuit court abused its discretion when it refused to give the defense's proposed "duty to retreat" instruction.[6] We also find that the jury was not properly instructed because of the circuit court's failure to give the "duty to retreat" instruction. Accordingly, the circuit court erred in not granting Dinger a new trial.

B. Failure to Grant a New Trial, Error in Allowing Gruesome Pictures, Failure to Dismiss Case, Failure to Dismiss Indictment, and Failure to Dismiss Murder Charges

■ Dinger further argues that the circuit court erred in not granting him a new trial based on newly discovered evidence contained in the results of the gunshot residue test; that the court erred in allowing certain gruesome photographs into evidence; and that the court erred in failing to dismiss the indictment, first and second degree murder charges, and the case as a whole. Because we have already determined that Dinger is entitled to a new trial based upon the failure of the court to give his proposed "duty to retreat" instruction, we need not address the remaining matters, all of which will be resolved on retrial. In particular, we note that the issue of Dinger's entitlement to a new trial on the basis of newly discovered evidence is now moot because he has been granted a new trial for other reasons. Obviously, he will have an opportunity to further develop that new evidence on retrial.

## IV.

### CONCLUSION

We conclude, then, that Dinger is entitled to a new trial to include an instruction on the "duty to retreat." Accordingly, we reverse and remand this matter to the Circuit Court of Monroe County for retrial.

Reversed and Remanded for retrial.

---

6. The second instruction proposed by the defense was in regard to "accident":

Manslaughter or murder are the result of some intentional act which causes the death of another. Negligent or accidental homicide are neither manslaughter or murder. If the jury finds that the State has not proven beyond a reasonable doubt that Larry Dinger intentionally pulled the trigger the weapon [sic] causing it to fire, then you must find him not guilty, as he could not be held criminally responsible. The court refused the defense's instruction and, instead, instructed the jury that it could render one of five verdicts: Guilty of murder of the first degree, guilty of murder of the second degree, guilty of voluntary manslaughter, guilty of involuntary manslaughter, or not guilty. Included in that instruction was the definition of involuntary manslaughter, which the court ex-

plained was the "accidental causing of death of another person, although unintended, which death is the proximate result of negligence so gross, wanton and culpable as to show a reckless disregard for human life."

We find that Dinger's proposed instruction regarding "accident" misstates the law. "The offense of involuntary manslaughter is committed when a person, while engaged in an unlawful act, unintentionally causes the death of another, or where a person engaged in a lawful act, unlawfully causes the death of another." Syl. Pt. 7, *State v. Barker*, 128 W.Va. 744, 38 S.E.2d 346 (1946); *State v. Hose*, 187 W.Va. 429, 432, 419 S.E.2d 690, 693 (1992). Accordingly, we cannot say that the circuit court abused its discretion in refusing to give Dinger's proposed "accident" instruction.