IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

**FILED**

**June 7, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 11-1336


STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

RICHARD A. WHITE,
Defendant Below, Petitioner

---

Appeal from the Circuit Court of Nicholas County
Honorable Gary Johnson
Criminal Action No. 10-F-79

AFFIRMED

---

Submitted:  April 17, 2013
Filed:  June 7, 2013


William C. Forbes, Esq.                     Patrick Morrisey, Esq.
W. Jesse Forbes, Esq.                        Attorney General
Forbes Law Offices, PLLC                     Scott E. Johnson, Esq.
Charleston, West Virginia                    Andrew D. Mendelson, Esq.
Attorneys for Petitioner                     Assistant Attorneys General
                                             Charleston, West Virginia
                                             Attorneys for Respondent


The Opinion of the Court was delivered PER CURIAM.

**SYLLABUS BY THE COURT**

1.      "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syl. Pt. 1, *State v. Paynter*, 206 W.Va. 521, 526 S.E.2d 43 (1999).

2.      "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

3.      "Under the 'plain error' doctrine, 'waiver' of error must be distinguished from 'forfeiture' of a right. A deviation from a rule of law is error unless there is a waiver. When there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined. By contrast, mere forfeiture of a right-the failure to make timely assertion of the right-does not extinguish the error. In such a circumstance, it is necessary to continue the inquiry and to determine whether the error is 'plain.'" Syl. Pt. 8, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

4.      "'""The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt.  Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).' Syl. Pt. 1, *State v. Juntilla*, 227 W.Va. 492, 711 S.E.2d 562 (2011)." Syl. Pt. 8, *State v. Stone*, 229 W.Va. 271, 728 S.E.2d 155 (2012).

5.      "'""A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden.  An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution.  The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. [ ] Credibility determinations are for a jury and not an appellate court.  Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. Pt. 3, in part, *State v. Guthrie*, 194

W.Va. 657, 461 S.E.2d 163 (1995).' Syl. Pt. 2, *State v. Juntilla*, 227 W.Va. 492,711 S.E.2d 562 (2011)." Syl. Pt. 9, *State v. Stone*, 229 W.Va. 271, 728 S.E.2d 155 (2012).

6. "'Once there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense.' Syl. Pt. 4, *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978)." Syl. Pt. 6, *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009).

7. "'It is peculiarly within the province of the jury to weigh the evidence upon the question of self-defense, and the verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence.' Syllabus point 5, *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927), [*overruled on other grounds*, *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009)]." Syl. Pt. 2, *State v. Whittaker*, 221 W.Va. 117, 650 S.E.2d 216 (2007).

8. "The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses." Syl. Pt. 2, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967).

9.	"Where there has been an unlawful homicide by shooting and the State produces evidence that the homicide was a result of malice or a specific intent to kill and was deliberate and premeditated, this is sufficient to support a conviction for first degree murder." Syl. Pt. 3, *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982).

10.	"Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed." Syl. Pt. 5, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

11.	"A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. Pt. 5, *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995).

12.	"Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the

comments were deliberately placed before the jury to divert attention to extraneous matters." Syl. Pt. 6, *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995).

13.     "'A motion for a new trial on the ground of the misconduct of a jury is addressed to the sound discretion of the court, which as a rule will not be disturbed on appeal where it appears that defendant was not injured by the misconduct or influence complained of.' Syllabus Point 7, in part, *State v. Johnson*, 111 W.Va. 653, 164 S.E. 31 (1932)." Syllabus, *State v. Gilliam*, 169 W.Va. 746, 289 S.E.2d 471 (1982).

Per Curiam:

The petitioner, Richard A. White, appeals his March 30, 2011, jury conviction of first degree murder in the Circuit Court of Nicholas County, West Virginia. By order entered August 23, 2011, he was sentenced to life in prison without the possibility of parole. In this appeal, the petitioner contends that multiple trial errors were committed, including instructional and evidentiary errors. The petitioner also argues that there was insufficient evidence to convict him of first degree murder or to prove beyond a reasonable doubt that he did not act in self-defense. Finally, the petitioner asserts that the trial court erred by denying his motion for a new trial based upon prosecutorial and juror misconduct. Upon our consideration of the record in this matter, the briefs and arguments of the parties, the applicable legal authority, and for the reasons discussed below, we affirm the petitioner's conviction.

## I. Factual and Procedural Background

It is undisputed that on the night of December 2, 2009, the petitioner went to the home of the victim, Harvey Hersman (hereinafter "Mr. Hersman" or "the victim"), and shot him three times in the head resulting in his death. Shortly thereafter, in the morning hours of December 3, 2009, the petitioner gave a video-taped statement to the police during

1

which he claimed that he had shot Mr. Hersman in self defense.[1]  Subsequently, the petitioner

was indicted on one count of murder for causing the death of Mr. Hersman.

According to the petitioner, he traveled to the residence of his former wife,

Kathy White, with his son, Robert White,[2] on the evening of December 2, 2009, to retrieve

some personal property he had left at her house.[3]  Upon learning that Ms. White was not at

home, the petitioner and his son walked next door to Mr. Hersman's residence.  During his

video-taped statement, the petitioner told the police that he believed that Mr. Hersman and

his former wife were engaged in a long-term love affair.

The petitioner stated that when they arrived at Mr. Hersman's home, his son

knocked on the door, but the petitioner entered the house alone.  In his statement to police,

the petitioner initially stated that "when I walked in Harvey Hershman's [sic] house, I did

have a knife[,] I did have a weapon;"[4] however, during the course of his statement, he also

---

[1]The taped statement was played for the jury without objection by the petitioner; a transcript of the petitioner's statement has been reviewed by this Court as part of the appendix record.  The petitioner did not testify at trial.

[2]Robert White is Kathy White's former stepson.

[3]Robert White's friend, Terry "T.G." Bennett, drove the men in his car.  Another person, Ashley Gates, was also a passenger in the car.  At all times relevant, Mr. Bennett and Ms. Gates remained in Mr. Bennett's car.

[4]In his statement to police, the petitioner described the knife as having "a special
(continued...)

2

indicated that he gave the knife to his son, explaining that he (the petitioner) had a volatile history with Mr. Hersman, and "I didn't want to look like a threat."[5] According to the petitioner, when he gave the knife to his son, the blade was closed. The petitioner's son, who also gave a statement to the police and testified at trial, stated that the petitioner was not angry or upset when they arrived at Mr. Hersman's house.

Thereafter, an altercation between the petitioner and the victim ensued. Ms. White, who was, in fact, at Mr. Hersman's home at the time, testified at trial[6] that as she entered the living room from the den,[7] she saw the petitioner on top of the victim on the

---

[4](...continued)
design on the blade (i.e., a notch) for . . . gutting a cow or deer . . . ."

[5]The petitioner told police that one of the reasons he brought his son with him to Mr. Hersman's house was to show him that he did not intend to start a fight. He explained that approximately one year earlier, while he was still living with Ms. White (next door to Mr. Hersman), he was sitting alone on his front porch when Mr. Hersman arrived with a gun and shot at him. It appears that this altercation had something to do with Ms. White. During the course of his police interview, the petitioner alluded to three other occasions when Mr. Hersman allegedly pulled a gun on him. The petitioner's son corroborated the petitioner's testimony that the victim had threatened him with a gun on prior occasions. Ms. White also testified that, in the past, Mr. Hersman had threatened to kill the petitioner. However, additional information about these alleged incidents is not a part of the record.

[6]At trial, Ms. White testified on behalf of the petitioner and denied that she and Mr. Hersman were involved in a romantic relationship. To the contrary, Ms. White testified that she and the petitioner were in the process of reconciling when the events herein transpired.

[7]Contrary to the petitioner's claim in his statement to the police that Ms. White was "naked" in the victim's bedroom and later emerged from the bedroom "half naked," Ms. White testified that she was, in fact, clothed, and had come to the victim's house to talk to
(continued...)

3

couch in the living room.[8]  She then heard the victim yell for her to get the petitioner off of him.  Ms. White fled the home and ran past the petitioner's son, who was standing on the front porch.  Ms. White, who testified that she did not see who started the altercation, called 9-1-1.

According to the petitioner's son, when he entered the home, he too saw the petitioner holding down Mr. Hersman on the couch.  He testified that he urged the petitioner to leave and that when he stood up from the couch, Mr. Hersman began hitting him and the two men resumed fighting.[9]  The petitioner's son further testified that he stood between the men and again urged his father to leave.

Contrary to the petitioner's statement to police, the petitioner's son stated that at that point during the altercation, the petitioner asked him to pick up his knife that was lying opened on the living room floor.  The petitioner's son testified that he then put the knife

---

[7](...continued)
him about her telephone and heating bills.  As indicated above, she also testified that she entered the living room from the den.

[8]Dr. Hamada Mahmoud, the Deputy Chief Medical Examiner in the West Virginia Office of the Chief Medical Examiner, testified that Mr. Hersman was five feet, eleven inches tall and weighed 180 pounds.  The petitioner was approximately six feet, three inches tall and weighed forty to fifty pounds more than the victim.

[9]The evidence revealed that various pieces of furniture were turned over and broken throughout the home as a result of the physical altercation.

in the pocket of his hoodie. According to both the petitioner and his son, Mr. Hersman then ran into the kitchen and the petitioner ran after him. In the kitchen area, Mr. Hersman retrieved a .45 caliber pistol, which was in its holster. The petitioner hit Mr. Hersman in the head with the lid of a pressure cooker and grabbed the gun from his hand. The petitioner's son testified that he tried to grab the gun from his father's hand while again trying to convince him to leave. Meanwhile, according to both the petitioner and his son, Mr. Hersman ran to another room and obtained a .357 revolver. He returned to the kitchen area and fired a shot. The petitioner and his son both testified that they were unable to see if Mr. Hersman shot the gun towards them. Although the petitioner's son testified that he believed Mr. Hersman was aiming at them, the evidence revealed that the bullet hole on the wall from the bullet fired from the gun was only two feet from the floor. The petitioner's son testified that, based upon the diagram of the victim's home about which he was questioned at trial, he was not standing near where the bullet hole was found. The petitioner's son stated that he left the home after Mr. Hersman fired the gun.

Thereafter, according to the petitioner's statement to police, he knocked the second gun (i.e., the .357 revolver) out of the victim's hand and onto the floor, removed the .45 pistol from the holster, and fired it at Mr. Hersman. In his statement to police, the petitioner admitted that upon realizing there were no bullets in the chamber, he "shucked the

5

shell in [the gun]" and shot Mr. Hersman in the head.[10]  Mr. Hersman fell onto a metal fan, at which time the petitioner shot him in the head two more times from close range.  More specifically, he told police that

> after . . . he had the gun and I knocked that gun out of his hand [when] he had the other gun and I took that gun from him and whenever I aimed it at him and [it] clicked, he just kind of looked at me and laughed and he looked over at that other gun. When he looked over at the other gun, I shucked the shell in it and it had a shell in it and I shot it. . . . Because, like I said when I took that gun away from him, [he] [came] back with another one and when he had the other one, that's whenever I took it away from him.  Well, when I took it away from him, I stepped back.  I seen him unarmed and I can't say that I wasn't in . . . mind of shooting him anyway.

The petitioner admitted to police that he "shot him three times in the head."[11] The petitioner's son testified that, given that the car in which he and the petitioner were riding was parked at Ms. White's house (approximately one hundred yards away), the petitioner would not have been able to leave the victim's home alive without shooting him. The police found an open locked-blade knife under the victim's body.[12]

---

[10]Dr. Mahmoud testified that the first shot the petitioner fired into the victim's head was not a fatal shot.

[11]According to Dr. Mahmoud, the victim died from multiple gunshot wounds.

[12]It is unclear from the record whether the knife found underneath the victim's body was the same knife the petitioner brought to the home.

The petitioner immediately returned to his own home, wrapped the .45 pistol in a plastic bag and, along with a blue pill crusher he took from the victim's home,[13] buried it underneath a split rail fence along the property line.

Following his arrest and during the course of his interview with police, the petitioner's dislike for the victim was well established. The petitioner told police that when he entered the victim's house, "I did have a knife[,] I did have a weapon and . . . I said Harvey, you know we got a problem and he said you [are] damn right we do. . . ." The petitioner further admitted to police that "as far as everything I know about Harvey Hershman [sic], that ain't nothing you want in your neighborhood anyway[;]" "[s]ome things that he's done to me that I mean I just don't like the guy at all. . . . And I know some things on the guy that just, he's dirty[;]" "somebody as that man, he ain't safe to be on the street. He's corrupting somebody, he's a bad influence on somebody." As indicated above, he admitted that when he took the .45 pistol away from the victim, he saw him "unarmed and I can't say that I wasn't in . . . mind of shooting him anyway. . . ."

---

[13]Dr. Mahmoud testified that the autopsy of the victim revealed methamphetamine in his system. At an admissibility hearing conducted on January 21, 2011, the State advised the trial court that it had seized methamphetamine from the victim's home; however, because the drugs had not been tested, the State did not request the admission of either the drugs or the blue pill crusher. *See* discussion *infra*.

7

At trial, the jury rejected the petitioner's claim of self defense and convicted him of first degree murder. He was sentenced to life in prison without the possibility of parole. The petitioner's post-trial motion for a new trial was denied by order entered July 20, 2011. This appeal followed.

## II. Standard of Review

The appellant has presented several assignments of error for our review. In Syllabus Point 1 of *State v. Paynter*, 206 W.Va. 521, 526 S.E.2d 43 (1999), this Court held, "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)." This Court has also indicated that a circuit court's final order and ultimate disposition are reviewed under an abuse of discretion standard. Syl. Pt. 1, in part, *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997).

The more specific standards of review will be incorporated into the discussion below.

## III. Discussion

As set forth above, the petitioner has asserted several assignments of error. Each error will be discussed below.

### A. Instructional Error

The petitioner contends that the trial court improperly instructed the jury on the issue of self-defense. More specifically, the petitioner argues that the trial court abused its discretion in giving the following instruction, which he contends was unsupported by the evidence and a misstatement of the law:

> When there is a quarrel between two or more persons and both are at fault, and a combat as a result of such quarrel takes place and death ensues as a result, in order to reduce the offense to killing in self-defense, two things must appear from the evidence and circumstances in the case: First, before the mortal shot was fired, the person firing the shot declined further combat; and (2) [sic], that he necessarily killed the deceased in order to preserve his own life, or that of another, or to protect himself or another from great bodily harm if evidence of self-defense is present.

The petitioner further argues that the trial court erred by refusing to give three of his proposed instructions, the failure of which precluded the jury from fairly considering whether he acted in self-defense or whether the evidence supported the lesser included offense of voluntary manslaughter.[14]

---

[14]The petitioner contends that the trial court should have included the following
(continued...)

9

instructions in the jury charge:

> Under the laws of this state, when one without fault himself is attacked by another in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life or that of another person, or to do him or another person some great bodily harm, and there is reasonable grounds for believing the danger imminent, that such design will be accomplished, and the person assaulted has reasonable ground to believe, and does believe, such danger is imminent, he may act upon such appearances and without retreating, use deadly force against his assailant, if he has reasonable grounds to believe, and does believe, that use of such force is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out, that the appearances were false, and that there was in fact neither design to do him some serious injury nor danger, that it would be done. But all of this the jury must judge from all the evidence and circumstances of the case.

> A Petitioner who is not the aggressor and has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant has the right to employ deadly force in order to defend himself. *State v. Dinger,* 624 S.E.2d 572 (W.Va. 2005) citing to Syl. Pt. 7, *State v. Cain,* 20 W.Va. 679 (1882), Syl. Pt. 6, *Feliciano v. 7-Eleven, Inc.* 210 W.Va. 740, 559 S.E.2d 713 (2001).

> The Court instructs the jury that reasonable provocation means those certain acts committed against the Petitioner, which would cause a reasonable man or woman to use deadly force. Inherent in this concept is the further requirement that the provocation be such that it would cause a reasonable person to lose control of himself and act out of the heat of passion, and

The petitioner concedes that he failed to object either to the instruction given or to the trial court's refusal to give the instructions he proposed. Thus, on appeal, he argues that this Court should review this assignment of error under a plain error analysis. The plain error doctrine "grants appellate courts, in the interest of justice, the authority to notice error to which no objection has been made." *State v. Miller*, 194 W.Va. 3, 17, 459 S.E.2d 114, 128 (1995). It has been explained as follows:

> To trigger application of the "plain error" doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.

*Id.*, at 7, 459 S.E.2d at 117, syl. pt. 7. *See Id.*, at 17 n.23, 459 S.E.2d at 128 n.23 (stating that "in West Virginia criminal cases[,] the sole bases for attacking an unobjected to jury charge are plain error and/or ineffective assistance of counsel."). It is the State's contention, however, that, under the circumstances of this case, the petitioner's failure to object constituted a waiver and, thus, plain error does not apply. We agree.

This Court has previously established that

> Under the "plain error" doctrine, "waiver" of error must be distinguished from "forfeiture" of a right. A deviation from a rule of law is error unless there is a waiver. When there has

---

[14](...continued)
that he did in fact do so. *State v. Morris,* 142 W.Va. 303, 95 S.E.2d 401; *State v. Galford,* 87 W.Va. 358, 105 S.E. 237; *State v. Clifford,* Syl. Pts. 10-11, 59 W.Va. 1, 52 S.E. 981.

been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined. By contrast, mere forfeiture of a right-the failure to make timely assertion of the right-does not extinguish the error. In such a circumstance, it is necessary to continue the inquiry and to determine whether the error is "plain."

*Miller*, 194 W.Va. at 7, 459 S.E.2d at 117, syl. pt. 8. *See* Syl. Pt. 4, *State v. Donley*, 216 W.Va. 368, 607 S.E.2d 474 (2004). Upon review of the record below, it is clear that the petitioner knowingly and intentionally relinquished the right to have the jury instructed in the manner in which he now argues on appeal. The trial transcript reveals that at the end of the first day of trial, the trial court advised the parties that he had completed the jury charge, stating

> I would ask you to read that over tonight. And in the morning, if you have – I know that I've received defense instructions, and I've tried to cover most of them.
>
> So, all I want is additional instructions to the charge that I've done and any objections to the charge. So we'll take those up first thing in the morning before we bring the jury in . . . .

The following day, after the close of all the evidence, the trial court referred the parties to the changes it had made to the jury charge. In response thereto, the petitioner's counsel unequivocally stated, "Your Honor, we've reviewed it and we're perfectly fine with it. No objections." Following a recess in the proceedings, the trial court revisited the issue with counsel, stating, "again, for purposes of the record, the charge that I have prepared, as

12

I understand, the Defendant has no objection or exceptions to the charge. Is that correct . . . ?" Counsel for the petitioner replied in the affirmative.

The record is, therefore, clear that the petitioner twice assured the trial court, after reviewing the completed jury charge, that he was satisfied with its contents and had no objection. Therefore, the petitioner knowingly and intelligently waived any right to have the jury instructed in the manner proposed in this appeal. Accordingly, the plain error doctrine does not apply.

**B. Admission of Robert White's Prior Statement to Police**

We next address the petitioner's argument that the trial court erred by allowing the State to improperly impeach its own witness, Robert White (the petitioner's son) by introducing into evidence the prior statement he gave to police. The petitioner contends that the statement his son gave to the police was inconsistent with the testimony he gave at trial and was used as substantive evidence by the State in violation of this Court's holding in *State v. Collins*, 186 W.Va. 1, 409 S.E.2d 181 (1990).

This Court held in syllabus point two of *Collins* that

[a] prior statement of a witness, even if given under oath, during the course of a police interrogation is not a statement made subject to the penalty of perjury or during a trial, hearing, or

13

other proceeding as required by Rule 801(d)(1)(A) of the West Virginia Rules of Evidence.

186 W.Va. at 2, 409 S.E.2d at 183. As such, the statement cannot be used as substantive evidence. *Id.*, at 3, 409 S.E.2d at 183, syl. pt. 1, in part. Nonetheless, "Rule 607 of the West Virginia Rules of Evidence allows a party, including the one who called the witness, to impeach a witness by a prior inconsistent statement." *Id.*, at syl. pt. 3. When a party seeks to use a prior out-of-court statement to impeach a witness's credibility, the trial court is required, even in the absence of a request, to give a cautionary instruction advising the jury that the statement cannot be considered as substantive evidence. *Id.*, at 10, 409 S.E.2d at 190. The petitioner asserts that the trial court failed to give such an instruction and thereby committed plain error.

This Court recognized in *Collins* that the failure to give such a cautionary instruction is subject to a plain error analysis. *Id.* However, upon review of the record, we find that in this instance, the petitioner waived his right to assert such error. *Miller*, 194 W.Va. at 7, 459 S.E.2d at 117, syl. pt. 8. *See also* Syl. Pt. 2, *State v. McWilliams*, 177 W.Va. 369, 371, 352 S.E.2d 120, 122 (1986) (quoting Syl. Pt. 2, *State v. Bowman*, 155 W.Va. 562, 184 S.E.2d 314 (1971) (A party "'will not be permitted to complain of error in the admission of evidence which he offered or elicited, and this is true even of a defendant in a criminal case.'"). In that regard, the record shows that during the cross-examination of Corporal Ron Thomas, who testified prior to the petitioner's son, counsel for the petitioner told Corporal

14

Thomas that he could utilize the statement of petitioner's son to answer a question. Further, the record reflects that the petitioner relied upon the prior statement of his son during his closing argument, referring directly to it.[15] Given the fact that the petitioner utilized his son's prior statement, we find that he has waived any right to claim any error in its admission.[16]

## C. Sufficiency of the Evidence

The petitioner contends that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he did not act in self-defense or to support a jury

---

[15]During closing argument, the petitioner's counsel directed the jury to "[r]ead . . . Robert's statement. Robert says Harvey Hersman started punching his dad again, and the fight starts back up and then he goes to get a gun." The petitioner's counsel further stated, with regard to Robert White's statement to police, that "he gave [the police] a statement that they thought helped them. Look at that statement. It says he, Harvey Hersman, was the aggressor."

[16]Upon reviewing the prior statement of the petitioner's son, we were also unable to conclude that the petitioner's self-defense theory was substantially prejudiced by the admission thereof. In comparing the statement the petitioner's son provided to police with his trial testimony, it is apparent that it was consistent with his trial testimony that he accompanied his father to Mr. Hersman's home in order to collect his belongings from his former wife; that, when the petitioner's son entered the victim's home, the petitioner was holding the victim down on the couch; that it was the victim who began hitting the petitioner when the two men got up from the couch; and that, after the petitioner's son entered, the petitioner asked him to pick up the opened knife that was lying on the floor. The testimony of the petitioner's son and his prior statement were also consistent insofar as the petitioner's son stated that he observed the victim retrieve a gun; that the petitioner grabbed the gun; and that the victim retrieved a second gun and fired a shot. The petitioner's son further testified that, given these circumstances, the petitioner would not have been able to leave the home alive without shooting the victim.

15

conviction of first degree murder. In reviewing criminal convictions on appeal, this Court

has held as follows:

> "'The function of an appellate court when reviewing the
> sufficiency of the evidence to support a criminal conviction is to
> examine the evidence admitted at trial to determine whether
> such evidence, if believed, is sufficient to convince a reasonable
> person of the defendant's guilt beyond a reasonable doubt. Thus,
> the relevant inquiry is whether, after viewing the evidence in the
> light most favorable to the prosecution, any rational trier of fact
> could have found the essential elements of the crime proved
> beyond a reasonable doubt.' Syl. Pt. 1, *State v. Guthrie*, 194
> W.Va. 657, 461 S.E.2d 163 (1995)." Syl. Pt. 1, *State v. Juntilla*,
> 227 W.Va. 492, 711 S.E.2d 562 (2011).

Syl. Pt. 8, *State v. Stone*, 229 W.Va. 271, 728 S.E.2d 155 (2012). Furthermore,

> "'A criminal defendant challenging the sufficiency of the
> evidence to support a conviction takes on a heavy burden. An
> appellate court must review all the evidence, whether direct or
> circumstantial, in the light most favorable to the prosecution and
> must credit all inferences and credibility assessments that the
> jury might have drawn in favor of the prosecution. The evidence
> need not be inconsistent with every conclusion save that of guilt
> so long as the jury can find guilt beyond a reasonable doubt. [ ]
> Credibility determinations are for a jury and not an appellate
> court. Finally, a jury verdict should be set aside only when the
> record contains no evidence, regardless of how it is weighed,
> from which the jury could find guilt beyond a reasonable doubt.'
> Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d
> 163 (1995)." Syl. Pt. 2, *State v. Juntilla*, 227 W.Va. 492,711
> S.E.2d 562 (2011).

*Stone*, 229 W.Va. at 273, 728 S.E.2d at 158, syl. pt. 9. *See* Syl. Pt. 5, *State v. Bailey*, 151

W.Va. 796, 155 S.E.2d 850 (1967) (""""To warrant interference with a verdict of guilt on the

ground of insufficiency of evidence, the court must be convinced that the evidence was

manifestly inadequate and that consequent injustice has been done." Point 1 Syllabus, *State v. Bowles*, 117 W.Va. 217 (185 S.E. 205).' Part, Point 4 Syllabus, *State v. Etchell*, 147 W.Va. (338) 339 (127 S.E.2d 609)"). With the foregoing standards of review in mind, we proceed to address the petitioner's contention that the evidence was insufficient to support his conviction.

As indicated above, the petitioner argues that the evidence admitted at trial was insufficient to prove to a rational jury beyond a reasonable doubt that he did not kill the victim in self-defense or to support his conviction of first degree murder. In support of these arguments, the petitioner states that the evidence demonstrated that he went to the victim's house to retrieve some of his personal property from his former wife; that the victim shot at him on several prior occasions; that he entered the home unarmed; and that the victim shot at both him and his son with one of two guns he had in his possession. The petitioner further contends that the evidence showed that he was not the aggressor; that he shot the victim because the victim was reaching for a gun and he feared for his life; and that, as his son testified at trial, the petitioner would not have been able to leave the victim's home alive without shooting him. However, the State argues that, when viewed in the light most favorable to the prosecution, the evidence proved beyond a reasonable doubt that the petitioner did not act in self-defense when he killed the victim by shooting him three times in the head. Likewise, the State argues that, viewing the evidence in the light most favorable

17

to the prosecution, it was sufficient to prove, beyond a reasonable doubt, the elements of first

degree murder.

## 1. Self-Defense

It is well established that

> "[o]nce there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense." Syl. Pt. 4, *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978).

Syl. Pt. 6, *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009). Furthermore,

> "[i]t is peculiarly within the province of the jury to weigh the evidence upon the question of self-defense, and the verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence." Syllabus point 5, *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927), [*overruled on other grounds*, *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009)]."

Syl. Pt. 2, *State v. Whittaker*, 221 W.Va. 117, 650 S.E.2d 216 (2007). *See State v. Clark*, 175

W.Va. 58, 62, 331 S.E.2d 496, 500 (1985) ("We have historically been reluctant to interfere

with a jury verdict rejecting a claim of self-defense").

At the outset, we note that there is no dispute that the evidence in this case

raised a jury question as to whether the petitioner acted in self-defense. The evidence

presented at trial demonstrated that the petitioner had a particular and strong dislike for Mr.

Hersman because, among other things, he believed that he was carrying on a long-term love affair with his former wife and, further, had shot at the petitioner in the past. Nevertheless, the petitioner went to Mr. Hersman's home looking for Ms. White. The petitioner admitted to police that when he entered the home, he had a knife and told Mr. Hersman, "you know we got a problem . . . ." The police found an opened knife underneath the victim's body. Further, both Ms. White and the petitioner's son saw the petitioner–who was substantially larger in size than the victim–holding the victim down on the couch. Mr. Hersman called out to Ms. White for help. Even though the petitioner's son tried to persuade his father to leave the home after the men got up from the couch, the petitioner, instead, ran after the victim into the kitchen. After grabbing the first gun out of the victim's hand, the petitioner again ignored his son's plea to leave the home. Eventually, the petitioner knocked the second gun from the victim's hand, fired the first gun, and, upon realizing there were no bullets in the chamber, "shucked the shell in [it]" and shot the victim three times in the head. It is undisputed that the petitioner never sought medical assistance for the victim or contacted law enforcement. Instead, he left the victim there alone, returned to his own home, and buried the murder weapon.

"The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses." *Bailey*, 151 W.Va. at 796, 155 S.E.2d at 850, syl. pt. 2. Viewing the evidence in the light most favorable to the

19

prosecution, and crediting all inferences and credibility assessments that the jury might have drawn in favor of the prosecution, this Court concludes that the evidence was more than sufficient for the jury to find that the prosecution proved beyond a reasonable doubt that the petitioner did not act in self-defense. *See Stone*, 229 W.Va. at 273, 728 S.E.2d at 158, syl. pt. 9.

## 2. First Degree Murder

We next address the petitioner's argument that the evidence in this case was insufficient to sustain his conviction of first degree murder. The petitioner contends that the State failed to prove, beyond a reasonable doubt, that he acted with malice, deliberation, and premeditation in killing Mr. Hersman. The State counters, however, that there was more than sufficient evidence to prove that Mr. Hersman was killed as a result of the petitioner's specific intent to kill and that Mr. Hersman's homicide was deliberate and premeditated.

This Court has previously held that

> [w]here there has been an unlawful homicide by shooting and the State produces evidence that the homicide was a result of malice or a specific intent to kill and was deliberate and premeditated, this is sufficient to support a conviction for first degree murder.

Syl. Pt. 3, *State v. Hatfield*, 169 W.Va. 191, 198-99, 286 S.E.2d 402, 408 (1982). *See also State v. Bradford*, 199 W.Va. 338, 347, 484 S.E.2d 221, 229 (1997). With respect to malice, this Court has explained that

> [t]he customary manner of proving malice in a murder case is the presentation of evidence of circumstances surrounding the killing. *State v. Starkey*, 161 W.Va. at 522, 244 S.E.2d at 223. Such circumstances may include, inter alia, the intentional use of a deadly weapon, *State v. Toler*, 129 W.Va. 575, 579-80, 41 S.E.2d 850, 852-53 (1946), words and conduct of the accused, *State v. Hamrick*, 112 W.Va. at 166-67, 163 S.E. at 873, and, evidence of ill will or a source of antagonism between the defendant and the decedent, *State v. Brant*, 162 W.Va. 762, 252 S.E.2d 901, 903 (1979).

*State v. Evans*, 172 W.Va. 810, 813, 310 S.E.2d 877, 879 (1983). As for premeditation and deliberation, "there must be some evidence that the defendant considered and weighed his decision to kill." *Guthrie*, 194 W.Va. at 675, 461 S.E.2d at 181.

> Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

*Id.*, 194 W.Va. at 664, 461 S.E.2d at 170, syl. pt. 5.

The existence of malice, as well as premeditation and deliberation, is a question of fact reserved for the jury. *State v. Hutchinson*, 215 W. Va. 313, 322, 599 S.E.2d 736, 745 (2004); Syl. Pt. 4, *State v. Hamrick*, 112 W.Va. 157, 163 S.E. 868 (1932). In this case, there

21

was sufficient evidence from which the jury could have found the existence of these elements of first degree murder. With regard to malice, the petitioner's feeling of ill-will toward the victim was established from his statement to the police. As set forth above, the petitioner admitted telling the victim, "you know we got a problem" and also told police that "[s]ome things that he's done to me that I mean I just don't like the guy at all. . . . he's dirty[.]" Indeed, the evidence proved that the petitioner strongly disliked the victim and had a volatile history with him involving the petitioner's former wife.

As for premeditation and deliberation, the evidence showed that the petitioner went to the victim's house with a knife in hand and the police found an opened knife lying underneath Mr. Hersman's body. Further, the petitioner's son testified that he attempted to get his father to leave Mr. Hersman's house three times. Instead of leaving, the petitioner followed the victim into his kitchen. Critically, the petitioner proceeded to disarm the victim and then loaded the empty gun and fired a shot into the victim's head. The victim did not die from the first shot.[17] The petitioner then moved closer to the victim and shot him two more times in the head at close range. Thereafter, rather than calling for help, the petitioner left the victim's house and buried the murder weapon. When this evidence is viewed in the light most favorable to the prosecution, it was clearly sufficient to prove first degree murder beyond a reasonable doubt.

---

[17]*See supra* n.10.

22

## D. Prosecutorial Misconduct

Next, we address the petitioner's assignment of error that the prosecutor made improper comments to the jury regarding Kathy White's testimony that the victim had a blue pill crusher in his home. The petitioner argues that the prosecutor deliberately misled the jury about whether, in fact, a pill crusher existed, thereby damaging the credibility of Ms. White's testimony at trial.

As indicated previously, upon leaving the victim's home after the shooting, the petitioner took a pill crusher and, along with the gun he used to kill Mr. Hersman, buried it on the property where he lived. Prior to trial, the parties agreed that the State would not introduce evidence of the pill crusher or the fact that the petitioner took it and buried it. However, during the course of Ms. White's testimony, she described the victim as a drug abuser and dealer of methamphetamine and testified that, on the night in question, he was "[k]ind of out of his mind a little bit[,]" (i.e., high on drugs) before the petitioner arrived. In further describing what Mr. Hersman was doing before the petitioner arrived, Ms. White testified that he was sitting at his computer table, which had on it a small blue pill crusher. Following this testimony, the State advised the trial court that it intended to introduce evidence that the petitioner buried the pill crusher with the gun because Ms. White had raised the issue of the victim's drug use. Ultimately, however, the trial court ordered the parties to

"stay away from" the pill crusher. Thereafter, during the State's final argument, the prosecutor stated to the jury the following:

> Kathy wants you to believe that there was a pill crusher, a blue pill crusher back there by the–they was snorting meth. The state police investigated that. They didn't collect a blue pill crusher from that house.

It is the petitioner's contention that the prosecutor deliberately and willfully lied to the jury in an effort to discredit the testimony of Ms. White, the petitioner's only defense witness. The State counters that, although arguably improper, the petitioner failed to object to the prosecutor's comment about the pill crusher at the time it was made; therefore, on appeal, this Court must review the petitioner's argument for plain error. *See Miller*, 194 W.Va. at 7, 459 S.E.2d at 117, syl. pt. 7. The State argues that, given the evidence presented at trial, it is clear that the substantial rights of the petitioner were not affected by the prosecutor's remarks and, accordingly, there was no plain error. *See Id.*

This Court has previously stated that "[a] judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. Pt. 5, *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995). *See also* Syl. Pt. 5, *State v. McCracken*, 218 W.Va. 190, 624 S.E.2d 537 (2005). Indeed, "[t]he test is whether the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Sugg*, 193 W.Va.

24

at 404, 456 S.E.2d at 485. The determination of whether improper prosecutorial argument "has so prejudiced the trial process as to require reversal must be gauged from the facts of each trial." *Id.*, 193 W.Va. at 405, 456 S.E.2d at 486. As we held in syllabus point six of *Sugg*,

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

193 W.Va. at 393, 456 S.E.2d at 474. *See also* Syl. Pt. 8, *State ex rel. Kitchen v. Painter*, 226 W.Va. 278, 700 S.E.2d 489 (2010); *McCracken*, 218 W.Va. at 192, 624 SE.2d at 539, syl. pt. 4.

In the case *sub judice*, although the prosecutor's comment that the police did not find a blue pill crusher at the victim's home was technically true, it was, nevertheless, misleading. However, the comment was isolated and there is no evidence that it was deliberately placed before the jury for the purpose of diverting attention to extraneous matters. Furthermore, absent the remarks, and as previously discussed herein, the evidence presented at trial was more than sufficient to establish the petitioner's guilt of first degree

25

murder and to prove, beyond a reasonable doubt, that the petitioner did not act in self-

defense.[18]

---

[18]We note that the petitioner alleges several other instances of prosecutorial misconduct–all but one of which was objected to at trial. Because we find them to be totally without merit, they will not be addressed in detail. First, the petitioner argues that, during closing argument, the prosecutor improperly commented on the petitioner's refusal to testify by stating that the petitioner, "through his attorney, says this was in self-defense" and by then specifically referring to the petitioner's taped statement to police. As previously indicated, the petitioner's statement was admitted into evidence without objection and, based upon our review of the record, the prosecutor simply read portions of it to the jury. The petitioner offers no supporting legal authority prohibiting a prosecutor from relying on an accused's properly-admitted statement when the accused elects not to testify.

The petitioner further argues that the prosecutor failed to disclose exculpatory evidence that the victim's girlfriend "moved" the body when she arrived at his home after the petitioner left, thereby contaminating the crime scene. Prior to trial, the victim's girlfriend executed an affidavit in which she stated that, upon finding the body, she touched it to see if the victim would respond but that she did not move it in any way. The trial court properly concluded that this evidence was not exculpatory and that there was no misconduct by the prosecutor.

The petitioner then argues that the prosecutor engaged in wild speculation designed to inflame the jury by focusing on the knife that the petitioner stated he gave to his son, who testified that he picked it up from the floor of the victim's home. As previously noted, however, the petitioner's own statement was internally inconsistent in that he told police that when he walked into Mr. Hersman's home, "I did have a knife[,] I did have a weapon" but then later claimed that he gave the knife to his son before entering. This Court has stated that a prosecutor may argue all reasonable inferences from the evidence. *State v. Messer*, 223 W.Va. 197, 203, 672 S.E.2d 333, 339 (2008).

The petitioner also alleges that the prosecutor improperly elicited extraneous, irrelevant and highly prejudicial testimony from the investigating officer regarding whether the officer could return to the victim's home to collect specific evidence about which he was questioned by the petitioner's counsel. In response to the prosecutor's question, the officer testified that he was unable to collect the evidence from the victim's home because "[t]hat house mysteriously caught on fire and burnt to the ground." The petitioner contends that, in asking this question, the prosecutor "slyly impl[ied]" and "insert[ed] [his] own belief that Petitioner was somehow responsible for this mysterious burning." The petitioner also contends that the prosecutor further inflamed the jury by eliciting testimony from this same

(continued...)

26

## E. Juror Misconduct

Finally, we address the petitioner's argument that he should have been granted a new trial based upon evidence which he claims shows that at least one juror–and perhaps the entire jury panel–predetermined his guilt prior to the close of all the evidence. Specifically, the petitioner argues that Juror Denis Paschke possessed an unassailable bias and prejudice which prevented her from impartially considering self-defense as a valid justification for shooting the victim, and as a result, he was denied his constitutional right to

---

[18](...continued)
officer regarding the severe damage that is caused by the type of ammunition used in the gun that killed Mr. Hersman even though the gun and ammunition belonged to the victim. Additionally, the petitioner claims that the prosecutor employed uncalled-for sarcasm when asking the petitioner's son whether the victim told the petitioner to get out of his house during the altercation. The allegedly improper remarks about which the petitioner now complains–if, in fact, they were improper–did not clearly prejudice the petitioner or result in manifest injustice such that his conviction should be set aside. *Sugg*, 193 W.Va. at 393, 456 S.E.2d at 474, syl. pt. 5.

Finally, the petitioner argues that the prosecutor improperly asked one of the investigating officers if the victim gave a statement as to how the fight between the men began. Unlike the above-described instances of alleged prosecutorial misconduct, the petitioner timely objected to this line of questioning, arguing that the prosecutor was "trying to play [to] the jury with the fact that Hersman died in this fight." The trial court overruled the objection on the ground that the question was asked in the context of the officer's explanation of what evidence the police relied upon in determining who started the fight. The trial court further indicated that it was the petitioner who first inquired as to what evidence formed the basis of the officer's opinion in this regard. This Court has explained that "[a] trial court's evidentiary rulings . . . are subject to review under an abuse of discretion standard." Syl. Pt. 4, in part, *State v. Roussadakis*, 204 W.Va. 58, 61, 511 S.E.2d 469, 472 (1998). The petitioner has failed to show any abuse of discretion by the trial court in admitting this evidence.

a fair and impartial jury.  The State counters that the petitioner has completely failed to carry his burden of proving any prejudice by the presence of Juror Paschke on the jury.  We agree.

This Court has previously established that "on a motion for a new trial, the burden is on the complaining party to show that he or she has been prejudiced by the presence of the juror on the jury."  *Blankenship v. Mingo Cnty. Economic Opportunity Comm'n.*, 187 W.Va. 157, 163, 416 S.E.2d 471, 477 (1992).  This Court has further held that

> "A motion for a new trial on the ground of the misconduct of a jury is addressed to the sound discretion of the court, which as a rule will not be disturbed on appeal where it appears that defendant was not injured by the misconduct or influence complained of."  Syllabus Point 7, in part, *State v. Johnson*, 111 W.Va. 653, 164 S.E. 31 (1932).

Syllabus, *State v. Gilliam*, 169 W.Va. 746, 289 S.E.2d 471 (1982).  Moreover, this Court reviews a trial court's order

> concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.

Syl. Pt. 3, in part, *State v Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

This Court has thoroughly reviewed the testimony presented with regard to the petitioner's allegations of juror misconduct.[19] The petitioner presented the testimony of his cousin, Shannon Atkins-George, who testified that, on the evening of the first day of trial, Juror Paschke came to her home on an unrelated matter[20] and, among other things, revealed to her that she was sitting on the petitioner's jury; that she and the other jurors had already determined that he "was nothing but a cold-blooded murderer;" and that she believed that "once you pull the trigger, you're a murderer." In contrast to Ms. Atkins-George's testimony, Juror Paschke unequivocally denied being at Ms. Atkins-George's home at any time during the course of the trial and further denied making the above-described statements to her. Significantly, the State presented the testimony of several neutral witnesses who provided objective testimony that was directly contrary to certain testimony given by Ms. Atkins-George; that seriously called into question her credibility; and that tended to disprove her claims that Juror Paschke acted improperly while serving on the petitioner's jury panel. In short, as the trial court determined in its order denying the petitioner's motion for a new trial, "the juror violations alleged by the defendant in his Motion for a New Trial were not shown to have occurred." The trial court's finding of fact in this regard is not clearly erroneous and,

---

[19]A hearing on the petitioner's post-trial motion for a new trial was conducted on May 5 and 27, 2011, and the transcript thereof is a part of the record herein.

[20]Juror Paschke is related by marriage to Ms. Atkins-George's young son and, according to Ms. Atkins-George, the purpose of her visit was to inquire about him.

29

further, the circuit court did not abuse its discretion in denying the petitioner's motion for a new trial based upon juror misconduct.

## IV. Conclusion

For the reasons stated above, the petitioner's conviction of first degree murder in the Circuit Court of Nicholas County is hereby affirmed.

Affirmed.