IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

_____

No. 16-1064

_____

FILED

**March 7, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Respondent

v.

AMBER LEE RICHARDSON,
Petitioner

_____

Appeal from the Circuit Court of Monroe County
The Honorable Robert A. Irons, Judge
Criminal Case No. 14-F-2

AFFIRMED

_____

Submitted: February 27, 2018
Filed: March 7, 2018

Paul R. Cassell, Esq.                     Patrick Morrisey, Esq.
Cassell & Crewe, P.C.                     Attorney General
Wytheville, Virginia                      Gordon L. Mowen, II, Esq.
Counsel for the Petitioner                Assistant Attorney General
                                          Charleston, West Virginia
                                          Counsel for the Respondent

JUSTICE KETCHUM delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "The granting of a continuance is a matter within the sound discretion of the trial court, though subject to review, and the refusal thereof is not ground for reversal unless it is made to appear that the court abused its discretion, and that its refusal has worked injury and prejudice to the rights of the party in whose behalf the motion was made." Syllabus Point 1, *State v. Jones*, 84 W.Va. 85, 99 S.E. 271 (1919).

2.      "Whether there has been an abuse of discretion in denying a continuance must be decided on a case-by-case basis in light of the factual circumstances presented, particularly the reasons for the continuance that were presented to the trial court at the time the request was denied." Syllabus Point 3, *State v. Bush*, 163 W.Va. 168, 255 S.E.2d 539 (1979).

Justice Ketchum:

Following a jury trial, Petitioner Amber Lee Richardson ("Defendant Richardson") was convicted of two felony counts—accessory to murder and conspiracy to commit murder. The jury did not recommend mercy and Defendant Richardson was sentenced to an incarceration term of life without the possibility of parole. On appeal, Defendant Richardson asserts that the trial court erred by (1) refusing to grant a continuance; (2) refusing to grant relief for an alleged discovery violation; (3) admitting gruesome photographs of the victim; and (4) declining to instruct the jury on the lesser included offenses of first degree murder. After review, we affirm Defendant Richardson's convictions and incarceration term of life without the possibility of parole.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 2013, Defendant Richardson's sister called the police and reported that Defendant Richardson's husband, Danny Ray Richardson ("decedent/husband"), was missing. The police interviewed Defendant Richardson who eventually admitted that she and her paramour, a tattoo artist named Joshua Hubbard ("Mr. Hubbard"),[1] had devised a plan to kill her husband. The plan was for Mr. Hubbard to hide under a chicken coop

---

[1] Mr. Hubbard was tried separately and convicted of first degree murder without a recommendation for mercy and conspiracy to commit a felony. He was sentenced to an incarceration term of life without the possibility of parole. This Court affirmed his convictions and sentence in *State v. Hubbard*, No. 14–1101, 2015 WL 7025873 (W.Va. Nov. 10, 2015) (memorandum decision).

1

near Defendant Richardson's house and ambush the decedent when he arrived at the property. Defendant Richardson gave Mr. Hubbard a nine-millimeter pistol that he used to kill her husband. Defendant Richardson admitted that on the day of the murder, she asked her husband to go home to cook dinner for their three young children in order to lure him onto the property by himself. After interviewing Defendant Richardson, the police searched her property and found her husband's body in the woods near the couple's house.

One of the central issues in this appeal is whether the circuit court erred by refusing to grant Defendant Richardson's motion for a third continuance (the court continued the trial twice at the request of Defendant Richardson). Therefore, we begin with a detailed review of the procedural history.

In January 2014, a Monroe County Grand Jury indicted Defendant Richardson on two felony offenses related to her husband's death: (1) "accessory to murder" in violation of W.Va. Code §§ 61-2-1 [1991] and 61-11-6(a) [2009], and (2) "conspiracy to commit a felony offense: murder" in violation of W.Va. Code § 61-10-31 [1971].

Defendant Richardson was arraigned on January 21, 2014, and entered a not guilty plea. Her trial was scheduled for April 8, 2014. The circuit court ordered that "discovery shall be exchanged by February 18, 2014." The State filed its initial

discovery disclosure on February 6, 2014,[2] identifying thirty-five items it had provided to counsel[3] for Defendant Richardson, including item 35(g) which consisted of "[c]ellular records for the cellular telephones used by [the decedent] and [Defendant Richardson]."

The State also disclosed and identified eleven items that were located in the evidence room of the West Virginia State Police that would be made available to counsel for Defendant Richardson for "inspection and/or photographing" at "the Union Detachment of the West Virginia State Police or at the West Virginia State Police Forensic Laboratory in Charleston, WV [sic]." These items included certain cellular records recovered from phones belonging to the decedent, Defendant Richardson and Mr. Hubbard, which were described as follows: "46. One (1) CD labeled Case #3013-292-1814 by the digital forensics unit, the Richardson case report which contains all information recovered by the Digital Forensics Unit in regards to the submitted items." ("Item 46 CD"). In addition to identifying the item 46 CD which contained all of the information recovered from the cellular phones, the State provided counsel for Defendant Richardson with a paper copy of an 18-page report that included "all of the text messages and phone calls that went to and from [Defendant] Richardson's phone [during the time it alleged she and Mr. Hubbard conspired] . . . between May 31[st] [2013] and June 3[rd]

---

[2] The State filed a supplemental discovery disclosure on February 18, 2014, identifying four additional items.

[3] Defendant Richardson was represented by Jeffrey S. Rodgers.

3

[2013]."  This 18-page report was provided to counsel for Defendant Richardson on February 6, 2014.

The circuit court held a hearing on March 25, 2014.[4]  At this hearing, counsel for Defendant Richardson requested that the trial be continued because he "needed more time to review the [discovery] materials provided by the State and to retain experts to assist in the defense."  The parties discussed the need for a continuance as follows:

> Defense Counsel:  Your Honor . . . I have not had the time, nor will I have the time between now and April 8 to go through all of these documents with Amber Richardson.  I need like at least 60 days or something.  I just got all this stuff.  I can't go through all of this with her between now and then [April 8].  I got, you know – the schedule is just unreal.  I cannot get ready between now and April 8th.
>
> . . .
>
> Circuit Court:  You've had since July.
>
> Defense Counsel:  I know.  But I just got – I just got all of the written – all these cell phone transcripts and CDs and everything.  I got, you know – I have to go through it all with Ms. Richardson.
>
> Circuit Court:  What's the State's position on the motion to continue the trial date?

---

[4] During this hearing, the court ruled that statements Defendant Richardson made to the police during their investigation would be admissible at trial, and that Defendant Richardson was competent to stand trial.  On appeal, Defendant Richardson does not contest either of these rulings.

4

Prosecutor: Your Honor, I just don't want there to be some kind of collateral attack on the conviction cause [sic] – I'm not going to oppose it strenuously, your Honor. If it is a continuance, it needs to be a short continuance. And I think we need to get some timelines. The Court should set some timelines by saying, if you're going to get experts, don't tell me you're going to do it – you have to do it by this day or you don't get – you don't get any.

I think in fairness, they've had the discovery for one month and one week. That's a short period of time for a capital murder case. I understand that. I'm not going to strenuously object to a continuance of the trial.
. . .

So I do want – if we're going to get – if we're going to continue it, I wouldn't oppose a 60-day continuance. But I think the Court should set a deadline for notifying me and the Court of who the experts are going to be and that they've been retained and everything's been provided to them.

Defense Counsel: That's fine, your Honor. We can just set a trial for the first of June.

The circuit court granted Defendant Richardson's motion for a continuance and rescheduled the trial for May 28, 2014.

The circuit court held a status conference on April 21, 2014. During this hearing, counsel for Defendant Richardson told the court that after researching battered woman's syndrome, he had determined that it was not a viable defense in this case, and, therefore, he did not need to retain an expert. Following this discussion, the circuit court and counsel for Defendant Richardson engaged in the following dialogue:

Circuit Court: Do you need another attorney to assist you in handling the case? You indicated that there was a voluminous amount of material to be reviewed.

5

> Defense Counsel: Judge, if I was going to get the battered woman's expert, I definitely needed somebody. But without the battered woman's defense, that expert – Amber [Defendant Richardson] and I can get through the material.
>
> Circuit Court: You going to be ready for trial then on the 28th [of May]?
>
> Defense Counsel: Yeah.
>
> Circuit Court: I mean, I'm happy to appoint another attorney to help you.
>
> Defense Counsel: I don't think I need one right now.

On May 23, 2014, five days before the trial was scheduled to begin, counsel for Defendant Richardson filed a second motion for a continuance, explaining that "counsel for Defendant is currently on bed rest due to mono and is unable to work until June 2, 2014." The circuit court granted this motion for a continuance and rescheduled the trial on June 10, 2014.

On June 6, 2014, four days before the trial was scheduled to begin, counsel for Defendant Richardson filed a third motion for a continuance. This motion provided that

> the State served pretrial discovery to Defendant on [sic] 6th day of February, 2014 which listed at number 35(g) a CD purportedly containing phone conversations between Defendant and Co-Defendant and others. That, upon information and belief the West Virginia Crime Lab failed to copy said CD. That, the information on this CD may contain exculpatory evidence that Defendant must review with counsel well in advance of trial.

6

The State filed a motion in opposition to the requested continuance, stating that it was

> not in possession of any recorded phone conversations between Defendant and her co-defendant. The State . . . is unaware of the existence of any such recordings. Item 35 listed in the State's Initial Discovery Disclosure is a CD containing several different digital files. Item 35(g) . . . are cellular telephone records of the Defendant and the victim which were obtained from their cellular telephone service provider. These records were provided to the Defendant on February 6, 2014.

Additionally, the State provided that in its initial discovery disclosure, it identified the item 46 CD containing all of the digital files and information retrieved from "the cellular telephones of [the victim], [Defendant] Amber Richardson and [Mr.] Hubbard, along with a report summarizing the work done by the Digital Forensics lab. The existence of Item number 46 listed in the State's initial discovery disclosure was disclosed to Defendant and her counsel on February 6, 2014."

As noted in the State's initial discovery disclosure, the item 46 CD was kept in the evidence room of the West Virginia State Police and was available for inspection by defense counsel at that location.[5] Additionally, according to the State, "the

---

[5] According to the prosecutor, "a copy of the [CD] was not provided to the defendant or to counsel for the State of West Virginia because the report itself states on it, not to be copied or disseminated. So the State Police kept it in the evidence room at the detachment." It appears the "do not copy" label placed on the CD was the result of an error due to the mistaken belief that the CD contained child pornography. Because it was

(continued . . .)

most relevant evidence contained within the material on Item 46 listed in the State's initial discovery disclosure are the deleted text messages and phone calls recovered from the Defendant's cellular telephone. A separate, [18-page] paper copy . . . listing the text messages and phone calls was provided to the Defendant on February 6, 2014." Finally, the State asserted that the materials relating to the cellular phone records it intended to rely on during trial were contained in the 18-page paper copy it provided to Defendant Richardson on February 6, 2014.

On June 9, 2014, the circuit court held a hearing on Defendant Richardson's motion to continue. At the beginning of this hearing, counsel for Defendant Richardson stated "I know the court's asked me before – I think I would like to ask if [lawyer] Ms. [Martha] Fleshman could help me." The only explanation defense counsel provided in support of this request was as follows: "I know it sounds sexist, but Ms. Richardson is a missus and Ms. Fleshman is a missus." The circuit court asked Ms. Fleshman if she would be willing to serve as co-counsel. After she replied in the affirmative, the circuit court granted defense counsel's request and appointed Ms. Fleshman as additional counsel for Defendant Richardson.

Regarding the third motion for a continuance, counsel for Defendant Richardson stated that he had received the item 46 CD from the State on June 6, 2014,

later determined that the item 46 CD did not contain any child pornography, the prosecutor eventually obtained it and provided it to counsel for Defendant Richardson.

and that he needed additional time to review it. The State asserted that (1) the item 46 CD had been identified in the initial discovery disclosure on February 6, 2014; (2) the contents of the item 46 CD had been described on February 6, 2014; (3) the location of the item 46 CD was provided to counsel for Defendant Richardson on February 6, 2014; and (4) counsel for Defendant Richardson was told explicitly that he could review the item 46 CD on February 6, 2014. The State emphasized that that the relevant materials contained on the item 46 CD—cellular phone records including the text messages between Defendant Richardson, the victim and Mr. Hubbard—were provided to Defendant Richardson on February 6, 2014, in an 18-page paper document.[6]

The circuit court denied Defendant Richardson's third motion for a continuance. It explained its ruling as follows:

> The Defendant was made aware of the [item 46 CD] at issue on February 6, 2014. The [item 46 CD] has been held in evidence at the Union Detachment of the West Virginia State Police for the past four months, if not longer. Additionally, a paper copy of the text messages contained on the [item 46 CD] was provided to the Defendant on February 6, 2014, and a copy of the [item 46 CD] itself was provided to Defendant's counsel on June 6, 2014, after it was requested.

---

[6] The prosecutor explained that "there's probably 2500 pages on that CD [item 46] of PDF files. But it's all just technical information that came off the phone, contacts, photographs, call logs, deleted text messages. That's what's on there. It's a lot – a lot of that is just computer gibberish, the path and all that, how it was saved."

The trial began on June 10, 2014, and lasted for two days.  The State's first witness was Sergeant Charles McKenzie, a West Virginia State Policeman.  He testified that he received a phone call on June 3, 2013, from Defendant Richardson's sister, Audrey Graham, who stated that she wanted to file a missing person's complaint regarding Defendant Richardson's husband.  Sergeant McKenzie interviewed Ms. Graham and Defendant Richardson's father, both of whom "voiced some concerns about . . . the fact that [Defendant Richardson] was not very clear as to when or why [her husband] may have left.  And then in addition, her father had made mention that he had heard shots fired in the general area where [the decedent and Defendant Richardson] were living."  Further, according to Defendant Richardson's father, Defendant Richardson stated that her "nine-millimeter pistol was missing."

After receiving this information, Sergeant McKenzie went to Defendant Richardson's residence to interview her.  Defendant Richardson stated that "she had no idea who [her husband] left with, just the fact that she had received a text message from him on Sunday evening stating that he was leaving, that someone was going to pick him up.  He would contact her at a later time to make arrangements to see the children."  When asked about the missing pistol, Defendant Richardson told Sergeant McKenzie that she found it and that it was in her bedroom.  Sergeant McKenzie found the gun "lying on the bed in pieces, taken down, taken apart."  Defendant Richardson told Sergeant McKenzie that her husband must have taken the gun apart.  Defendant Richardson also

10

provided her husband's cell phone to Sergeant McKenzie and explained that he must have left it behind.

Because Defendant Richardson's story "didn't seem to make all the sense in the world to me through my experience [as an investigator]," Sergeant McKenzie asked Defendant Richardson if she would come to the police station to further discuss her husband's absence. Defendant Richardson agreed and they prepared to leave her residence. As they were leaving the residence, Sergeant McKenzie stated

> I just happened to notice some clothing beside the back door, including some gloves, what appeared to be pants or shirts, boots. I asked [Defendant Richardson] if, you know – whose they are, why they were there. And she had told me . . . that they were [her husband's] and they had been there for several weeks. I could tell by the condition that they were in that they had not been outside in the weather for several weeks. So, I went and photographed them, although I did not take them into my possession.

Once arriving at the police station,[7] Defendant Richardson admitted that she and her husband had marital problems but she initially insisted that her husband had "just left." She also initially denied having an intimate relationship with Mr. Hubbard, stating that she had not seen or talked to him in months.

---

[7] Sergeant McKenzie began his interview with Defendant Richardson by explaining her Miranda Rights and having her fill out a "Miranda Rights form," which she completed voluntarily. Defendant Richardson was not under arrest at this time.

11

After Defendant Richardson denied having an intimate relationship with Mr. Hubbard, another officer, Corporal Richards, came into the interview room. According to Sergeant McKenzie, Corporal Richards "confronted her with the information we'd received that [Mr. Hubbard] may've been on the mountain that weekend." Thereafter, according to Sergeant McKenzie, Defendant Richardson become emotional and when asked again whether she knew what happened to her husband

> she said that they [she and Mr. Hubbard] had devised a plan over the previous two weeks . . . The plan was for [Defendant Richardson] to put out some clothing that Joshua Hubbard had left at their residence while he was staying there, put a sleeping bag out, place a nine-millimeter pistol that belonged to her in a specific area that they both knew. Then . . . that [Mr. Hubbard] would hide in the woods and, at some point, would ambush [the decedent], shooting him with that pistol and, thus, killing him. . . . Part of the plan was for . . . she and the children not to be around when it happened, for her to be at a friend's house or just be gone.

According to Sergeant McKenzie, Defendant Richardson stated that "she wasn't absolutely certain it [the plan] had been carried out . . . She did tell us that if it happened, had happened, that it may've been around an old chicken coop, which was about halfway up their driveway going to their house."

Upon receiving this information, Sergeant McKenzie ended the interview, contacted a number of other police officers, and returned to Defendant Richardson's property to determine if a crime had been committed. When he arrived at the property, Sergeant McKenzie noticed that the clothing, gloves, and boots that he had previously seen by the back door were gone. He then told the other officers that Mr. Hubbard may

12

be in the area. As one officer searched the wooded area behind the chicken coop, he observed a white male hiding in the woods. The officer told this person to stop. The white male, who the police assumed was Mr. Hubbard, ran and escaped from the police.[8]

The officers continued searching the property and located the body of the decedent. Sergeant McKenzie stated that the decedent's body initially was located behind the chicken coop "and then, it was obvious that he had been moved from that location to deeper into the woods, maybe 75, 100, 150 yards away under an overturned tree, where he had been covered with leaves, tree branches, debris to conceal his body." The officers found several nine-millimeter shell casings around this area.

Dr. Nabila Haikal, the deputy chief medical examiner, testified that she performed the autopsy on the decedent. She stated that the decedent died from a gunshot wound to the head and that he had also suffered a blunt force injury to his head.

The State also called Christopher Vance, a digital forensic analyst for the West Virginia State Police. He testified that he analyzed and prepared reports on the cellular phones belonging to Defendant Richardson, Mr. Hubbard, and the decedent. Mr. Vance testified that Defendant Richardson and Mr. Hubbard were communicating with each other between May 28, 2013, and June 1, 2013, the day of the murder. Following Mr. Vance's testimony, the State rested.

---

[8] Mr. Hubbard was captured by the police the following day, he was found hiding inside of a camper.

Defendant Richardson was the sole witness to testify for the defense. She stated that she married the decedent in 2006 and they had three children. Defendant Richardson talked to Mr. Hubbard for the first time over the telephone on March 17, 2013. Defendant Richardson explained that she was introduced to Mr. Hubbard through a mutual friend who handed her the telephone and said, "here, talk to him for a minute." The day after she spoke with Mr. Hubbard for the first time, Defendant Richardson drove to Virginia, picked Mr. Hubbard up and brought him back to West Virginia so that he could "do some tattoos for us, and he was supposed to stay two weeks . . . so he could do the tattoos and then I was supposed to take him home."

Mr. Hubbard stayed at Defendant Richardson and the decedent's residence for six weeks while he was doing various tattoo work.[9] During this time, Mr. Hubbard and Defendant Richardson began a sexual relationship. In early May 2013, Defendant Richardson, along with her three children, drove Mr. Hubbard back to Virginia. She and the children stayed with Mr. Hubbard for two nights in Virginia before returning home. After returning home, Defendant Richardson and Mr. Hubbard maintained their relationship through phone calls and text messages. Defendant Richardson stated that she wanted to get a divorce from her husband so that she could be with Mr. Hubbard.

---

[9] During this time, Mr. Hubbard did tattoo work on the decedent, Defendant Richardson, Defendant Richardson's sister, and Defendant Richardson's brother-in-law.

However, she testified that Mr. Hubbard "pushed for murder. He said that would be the best way."

Defendant Richardson testified that Mr. Hubbard formed a plan to shoot the decedent with her pistol. After forming this plan, Defendant Richardson drove to Virginia, with her three children, and brought Mr. Hubbard back to West Virginia on May 31, 2013. Mr. Hubbard stayed with a friend of Defendant Richardson's that evening. The decedent was not aware that Defendant Richardson returned to Virginia to pick up Mr. Hubbard.

Defendant Richardson testified that on the following day, June 1, 2013, she left a sleeping bag, clothing and a pistol "in the shed behind the house" for Mr. Hubbard. The plan was for Mr. Hubbard to retrieve those items, hide under the chicken coop, and ambush the decedent when he returned home. Defendant Richardson admitted that she sent Mr. Hubbard a text message prior to the murder that said "happy hunting." Defendant Richardson stated that she asked the decedent to go home to fix dinner for their children as a pretext for Mr. Hubbard to commit the murder.[10] She stated that after the murder, Mr. Hubbard "sent me a text saying it's done. Then he called me freaking out and begging me to come back."

---

[10] During cross-examination, the prosecutor asked, "[Y]ou used them [the children] to send their daddy to his death, didn't you? Go fix our kids dinner." Defendant Richardson replied, "Yes."

15

During cross-examination, the prosecutor asked Defendant Richardson, "You were an active involved participant in this plot, weren't you?" She replied, "Yes, I'm not denying that." Similarly, the prosecutor asked, "And you plotted to kill your husband?" Defendant Richardson replied, "Correct." Defendant Richardson also admitted that she and Mr. Hubbard had sexual relations in her residence on the night of the murder, while the decedent's body was "laying in the ground outside."

Following Defendant Richardson's testimony, the defense rested. The jury found Defendant Richardson guilty on both counts—accessory before the fact to first degree murder and conspiracy to commit murder. The jury did not recommend mercy on the charge of accessory before the fact to first degree murder. The circuit court sentenced Defendant Richardson to an incarceration term of life without the possibility of parole.[11] Thereafter, Defendant Richardson filed the present appeal.

## II. STANDARD OF REVIEW

Our standard of review is set forth in Syllabus Point 3 of *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000):

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and

---

[11] The circuit court sentenced Defendant Richardson to one to five years for the conspiracy charge, to run concurrently with her other sentence.

16

we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

### III. ANALYSIS

In this appeal, Defendant Richardson asserts the circuit court erred by (1) refusing to grant a continuance; (2) refusing to grant relief for an alleged discovery violation; (3) admitting gruesome photographs of the victim; and (4) declining to instruct the jury on the lesser included offenses of first-degree murder.

### A. Continuance

Defendant Richardson argues that the circuit court erred by refusing to grant her trial counsel's third request for a continuance. Defendant Richardson asserts that "the trial court was clearly aware that defense counsel was not prepared to go trial. Key evidence from [Defendant Richardson's] cell phone and the cell phones of [Mr. Hubbard] and the victim had never been reviewed." Further, Defendant Richardson argues that she was prejudiced by her trial counsel's failure to review the cellular phone records. She asserts, "[Defendant Richardson] testified at trial that there were additional text messages confirming that she only wanted a divorce and did not want her husband to be killed. Those messages were never offered into evidence because her trial counsel was not given time to review the recovered records[.]"

By contrast, the State argues that the circuit court correctly denied Defendant Richardson's third request for a continuance. The State asserts that the request for a continuance arose from Defendant Richardson's mistaken claim that certain

discovery—the item 46 CD—was only identified and provided to her counsel four days before the trial. The State counters that the item 46 CD was identified in the initial discovery disclosure on February 6, 2014; the nature and contents of the item 46 CD were described in detail on February 6, 2014; the location of the item 46 CD was provided to counsel for Defendant Richardson on February 6, 2014; and counsel for Defendant Richardson was told that he could review the item 46 CD on February 6, 2014. Further, the State argues that the relevant materials contained on the item 46 CD—cellular phone records including the text messages between Defendant Richardson, the victim and Mr. Hubbard—were provided to Defendant Richardson on February 6, 2014, in an 18-page paper document.

This Court has held that the granting of a continuance is a matter within the sound discretion of a trial court. In Syllabus Point 1 of *State v. Jones*, 84 W.Va. 85, 99 S.E. 271 (1919), we held:

> The granting of a continuance is a matter within the sound discretion of the trial court, though subject to review, and the refusal thereof is not ground for reversal unless it is made to appear that the court abused its discretion, and that its refusal has worked injury and prejudice to the rights of the party in whose behalf the motion was made.

Similarly, in Syllabus Point 3 of *State v. Bush*, 163 W.Va. 168, 255 S.E.2d 539 (1979), the Court explained "[w]hether there has been an abuse of discretion in denying a continuance must be decided on a case-by-case basis in light of the factual

18

circumstances presented, particularly the reasons for the continuance that were presented to the trial court at the time the request was denied."[12]

Our review reveals the circuit court did not abuse its discretion when it denied Defendant Richardson's third motion for continuance. First, we find no merit in Defendant Richardson's claim that her trial counsel lacked adequate time to review the item 46 CD containing the digital cellular records. Among the relevant factors to consider when assessing whether counsel had an adequate opportunity to prepare for trial are the time available for preparation, the degree of complexity of the case, the availability of discovery from the prosecution, and the likelihood of prejudice resulting from a denial of a motion to continue. *See* Syllabus Point 4, in part, *State v. Bush*.

We find these factors weigh in favor of the State. First, the State disclosed the item 46 CD to Defendant Richardson's trial counsel approximately four months before the trial. Further, the information the State relied on during the trial—cellular phone records including the text messages between Defendant Richardson, the victim and Mr. Hubbard—were provided to Defendant Richardson on February 6, 2014, in an 18-page paper document. We find no support for Defendant Richardson's position that a CD

---

[12] Also, in *Ungar v Sarafite*, 376 U.S. 575, 589 (1964), the United States Supreme Court observed that, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."

that is identified, described, and made available for inspection four months before trial, and well within the discovery deadline, did not afford defense counsel adequate time to review this item. We also note that the trial was continued on two occasions, thus affording defense counsel additional time to review the item 46 CD.

Next, we consider the complexity of the case. Our review reveals that this was a straightforward case—Defendant Richardson admitted that she was an active participant in the plot to murder her husband. She made this admission both to Sergeant McKenzie and during her trial testimony. All of the physical and medical evidence, as well as testimony from the police who investigated the case and from Defendant Richardson's sister and father supported this conclusion. There were no text messages, phone records or any other digital records that demonstrated Defendant Richardson was not an active participant in the plot to murder her husband. Defendant Richardson has not cited anything contained on the item 46 CD that suggests she "only wanted a divorce and did not want to murder her husband."

Further, we disagree with Defendant Richardson's argument that she suffered prejudice because of the circuit court's refusal to grant the third motion for a continuance. Defendant Richardson argues to this Court that "additional text messages confirming that she only wanted a divorce and did not want her husband to be killed" were not offered into evidence because her trial counsel did not have adequate time to review the item 46 CD. Again, this argument is unsupported by the record and by Defendant Richardson's trial testimony. We emphasize that on appeal to this Court,

20

Defendant Richardson has not cited any specific text message, phone call log, or any digital data contained in the item 46 CD that supports her argument that additional text messages demonstrate that she only wanted a divorce and did not want to kill her husband.

Next, Defendant Richardson's own trial testimony contradicts the argument that she only wanted a divorce and did not want her husband to be killed. While Defendant Richardson testified that she initially told Mr. Hubbard she could divorce her husband, she subsequently agreed with Mr. Hubbard's suggestion that they murder him. Defendant Richardson testified unequivocally that she was an active participant in the plot to murder her husband. She described in detail the actions she willingly took to complete this plan—after plotting with Mr. Hubbard, she drove to Virginia to pick him up, brought him back to West Virginia, provided him with the gun used to kill her husband, and asked her husband to return to their residence to fix dinner for their children as a pretext for Mr. Hubbard to ambush and murder the decedent. Defendant Richardson also told Sergeant McKenzie that she was an active participant in the plan to murder her husband. Therefore, we find that the circuit court's refusal to grant the third motion for a continuance did not result in prejudice to Defendant Richardson.[13]

_____

[13] Defendant Richardson also argued that the circuit court erred by denying the motion for a third continuance in light of its granting of defense counsel's request for appointment of co-counsel the day before trial. Defendant Richardson argues that the request for co-counsel demonstrated that Defendant Richardson's primary trial counsel

(continued . . .)

was unprepared for trial. In support of this argument, Defendant Richardson cites a number of examples of her trial counsel's ineffectiveness. In Syllabus Point 10 of *State v. Triplett*, 187 W.Va. 760, 421 S.E.2d 511 (1992), this Court held:

> It is the extremely rare case when this Court will find ineffective assistance of counsel . . . on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim.

Similarly, in *State v. Miller*, 194 W.Va. 3, 15, 459 S.E.2d 114, 126 (1995), we explained that

> [t]he very nature of an ineffective assistance of counsel claim demonstrates the inappropriateness of review on direct appeal. To the extent that a defendant relies on strategic and judgment calls of his or her trial counsel to prove an ineffective assistance claim, the defendant is at a decided disadvantage. Lacking an adequate record, an appellate court simply is unable to determine the egregiousness of many of the claimed deficiencies.

To the extent Defendant Richardson is asserting that her trial counsel's performance was ineffective, we decline to address an alleged ineffective assistance of counsel claim in this direct appeal. The record has not been developed on this issue. This is an issue that must be developed in a habeas corpus proceeding.

Further, Defendant Richardson has not cited any authority for the proposition that the appointment of co-counsel required the circuit court to continue the trial. In *State v. Phelps*, 197 W.Va. 713, 725, 478 S.E.2d 563, 575 (1996), this Court noted that it had not found any case law, statute, or rule "holding there is a federal or state constitutional right to appointment of co-counsel[.]" Because of the unique facts surrounding the appointment of co-counsel in the present case, we do not find that the circuit court abused its discretion by denying the request for a third continuance. While co-counsel was appointed on the day before trial, the circuit court had previously continued the trial on

(continued . . .)

22

## B. Discovery Violation

Defendant Richardson's second assignment of error is that the circuit court erred by refusing to grant a discovery violation against the State based on her assertion that the State did not provide the item 46 CD to the defense in a timely fashion. Defendant Richardson states that the discovery deadline was February 18, 2014, and asserts that the item 46 CD was not provided to her until June 6, 2014, four days before the trial.

In support of her argument, Defendant Richardson relies on Syllabus Point 2 of *State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980), wherein this Court held:

> When a trial court grants a pre-trial discovery motion requiring the prosecution to disclose evidence in its possession, nondisclosure by the prosecution is fatal to its case where such nondisclosure is prejudicial. The nondisclosure is prejudicial where the defense is surprised on a material issue and where the failure to make the disclosure hampers the preparation and presentation of the defendant's case.

We find Defendant Richardson's reliance on this case is misplaced because the State did not fail to disclose the existence of the item 46 CD. In the State's February 6, 2014, initial discovery disclosure it identified the CD, described its contents in detail, set forth the location of the CD, and alerted defense counsel where and how it could be

---

two occasions at the request of defense counsel. Further, defense counsel had previously been offered and refused co-counsel and had assured the circuit court in April 2014 that he would be prepared for trial.

23

reviewed.  Further, it provided an 18-page report listing the text messages from the item 46 CD it relied on during the trial to defense counsel on February 6, 2014, well within the discovery deadline.  Based on the foregoing, we find the circuit court did not err by refusing to grant a discovery violation against the State.

### C. Gruesome Photographs

Defendant Richardson's third assignment of error is that the circuit court erred by admitting "gruesome photographs" of the decedent taken by the medical examiner's office.  Defendant Richardson asserts that the circuit court did not undertake the proper analysis "pursuant to Rules 401-403 of the Rules of Evidence to determine the admissibility" of the alleged gruesome photographs.  Conversely, the State argues that the circuit court did not err by admitting these photographs because (1) Defendant Richardson did not raise a "gruesome photograph" objection during the trial, and (2) "it is manifestly apparent that these photographs are not gruesome."

The State introduced four autopsy photographs of the victim's injuries during the medical examiner's testimony.  Defense counsel objected to the admission of these photographs, explaining:

> [I]nasmuch as [Defendant Richardson] has given a full and complete statement of her involvement in this matter to the State Police . . . and the fact that Josh Hubbard's involvement in [the decedent's] death is uncontroverted, I just didn't see any reason for them.  We already have other pictures of [the decedent's] body after death out there at the house in the woods.  And so I was just going to ask the Court – I thought we'd pretty much established his manner of death and how it occurred.  I just thought it seemed a little like overkill.

24

It is clear that defense counsel did not object to the autopsy photographs on the basis that they were "gruesome." Thus, to the extent Defendant Richardson is asserting that the circuit court erred by failing to conduct an analysis of whether the photographs were gruesome, we find this argument fails because defense counsel did not object on the basis that the photographs were "gruesome."[14] *See State v. LaRock*, 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996*)* ("One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result in the imposition of a procedural bar to an appeal of that issue."). Further, Defendant Richardson has not asserted that it was plain error for the circuit court to admit these photographs.[15] Based on the foregoing, we find the circuit court did not abuse its discretion by admitting the autopsy photographs.

---

[14] This Court held in Syllabus Point 8 of *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994), that "[t]he admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence."

[15] This Court has held: "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syllabus Point 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995); *see also* Syllabus Point 2, *State v. White*, 231 W.Va. 270, 744 S.E.2d 668 (2013). We do not find that it was error for the circuit court to admit the autopsy photographs. This Court has previously addressed whether a particular photograph is gruesome. In *State v. Waldron*, 218 W.Va. 450, 458, 624 S.E.2d 887, 895 (2005), the Court explained

> it is within the discretion of a trial judge to admit photographs
> depicting trails of blood and the body of a shooting victim.

(continued . . .)

25

## D. Jury Instructions

Defendant Richardson asserts that the circuit court erred by denying defense counsel's request that the jury be instructed on second degree murder. Defendant Richardson argues that she was entitled to this instruction because she "testified that her will was overcome by [Mr.] Hubbard. Thus, to the extent that her criminal intent was at issue, the jury should have been instructed as to second degree murder."

By contrast, the State asserts that there was no evidentiary basis to support the giving of a second degree murder instruction. According to the State, there was

> *See State v. Wheeler,* 187 W.Va. 379, 419 S.E.2d 447 (1992). Moreover, in *State v. Young*, 173 W.Va. 1, 311 S.E.2d 118 (1983), we recognized that a body of a victim after autopsy procedures may be gruesome; however, where the body has not undergone such procedures, the picture is not gruesome. *Accord State v. Harper*, 179 W.Va. 24, 365 S.E.2d 69 (1987). We have also relied on the amount of blood and gore in the picture, and in whether the body is pictured with unnatural facial positions or contortions in determining that the photograph is not gruesome and in determining whether a photograph is prejudicial. *See State v. Parsons*, 181 W.Va. 56, 380 S.E.2d 223 (1989). Moreover, pictures that do not depict excessive blood and gore, but show puncture wounds are relevant to corroborate the State's testimony. *See State v. Haddox*, 166 W.Va. 630, 276 S.E.2d 788 (1981).

In the present case, the photographs depict the decedent in a sterile environment and provided a visual aid showing the injuries the medical examiner described in her testimony. While the photographs show the injuries, we do not find that they are necessarily "gruesome." Therefore, we do not find it was error for the circuit court to admit these photographs.

26

overwhelming evidence of premeditation and of Defendant Richardson's criminal intent "because she told the jury she planned to kill her husband. She admitted that she helped [Mr.] Hubbard kill her husband. She admitted that she was an active participant in this plot."[16]

Our standard of review for whether a jury has been properly instructed is set forth in Syllabus Point 4 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995):

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Additionally, a jury instruction must be based upon the evidence in the case. "Instructions must be based upon the evidence and an instruction which is not

---

[16] Justice Cleckley described the differences between the degrees of murder in *State v. Guthrie*, 194 W.Va. 657, 675-76, 461 S.E.2d 163, 181-82 (1995), stating "there must be some evidence that the defendant considered and weighed his decision to kill in order for the State to establish premeditation and deliberation under our first degree murder statute. This is what is meant by a ruthless, cold-blooded, calculating killing. *Any other intentional killing, by its spontaneous and nonreflective nature, is second degree murder*." (Emphasis added).

27

supported by evidence should not be given." Syllabus Point 4, *State v. Collins*, 154 W.Va. 771, 180 S.E.2d 54 (1971). "The question whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense." *State v. Neider*, 170 W.Va. 662, 664, 295 S.E.2d 902, 904 (1982). The State concedes that Defendant Richardson could satisfy the first inquiry.

"The second inquiry is a factual one which involves a determination by the trial court if there is evidence which would tend to prove such lesser included offense." *Id*. at 665, 295 S.E.2d at 905. Defendant Richardson's trial testimony established plainly and unequivocally that she plotted with Mr. Hubbard to murder her husband—she drove to Virginia to pick Mr. Hubbard up, provided him with the gun used to kill her husband, and asked her husband to return to their residence to fix dinner for their children as a pretext for Mr. Hubbard to ambush and murder the decedent. Because there was no evidence "which would tend to prove" the lesser included offense, *i.e.* that the killing was spontaneous and of a non-reflective nature, we find the circuit court did not abuse its discretion by declining to give the jury a second degree murder instruction.[17]

---

[17] Defendant Richardson also asserted that "the multiple errors [committed by the circuit court] warrant relief." Our standard for reviewing a cumulative error argument was set forth in Syllabus Point 5 of *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972): "Where the record of a criminal trial shows that the cumulative effect of
(continued . . .)

# IV. CONCLUSION

The circuit court's order sentencing Defendant Richardson to an incarceration term of life without the possibility of parole based upon her felony convictions for accessory to murder and conspiracy to commit murder is affirmed.

Affirmed.

---

numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." Further, this Court has recognized that the cumulative error doctrine "should be used sparingly" and only where the errors are apparent from the record. *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 118, 459 S.E.2d 374, 395 (1995).

After review, we find no merit in Defendant Richardson's cumulative error argument.